1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11    ROBERT A. COX,                    ) Case No. EDCV 17-0544-JPR
                                        )
12                    Plaintiff,        )
                                        ) **MEMORANDUM DECISION AND ORDER**
13            v.                        ) **AFFIRMING COMMISSIONER**
                                        )
14    NANCY A. BERRYHILL, Acting        )
      Commissioner of Social           )
15    Security,                         )
                                        )
16                    Defendant.        )
      _____  )
17

18    **I.    PROCEEDINGS**

19          Plaintiff seeks review of the Commissioner's final decision

20    denying his application for Social Security disability insurance

21    benefits ("DIB").  The parties consented to the jurisdiction of

22    the undersigned under 28 U.S.C. § 636(c).  The matter is before

23    the Court on the parties' Joint Stipulation, filed December 6,

24    2017, which the Court has taken under submission without oral

25    argument.  For the reasons stated below, the Commissioner's

26    decision is affirmed.

27

28

                                    1

## II. BACKGROUND

Plaintiff was born in 1966. (Administrative Record ("AR") 104.) He completed high school (AR 328) and last worked as a photojournalist (AR 128, 318).

On June 3, 2013, Plaintiff filed an application for DIB, alleging that he had been disabled since July 26, 2012, because of high blood pressure, bulging disc injury, angina, heart disease, and high cholesterol.[1] (AR 154-55, 166-67, 284-91.) After his application was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge. (AR 183, 194, 198.) A hearing was held on May 7, 2015, at which Plaintiff, who was represented by counsel, testified, as did a medical and a vocational expert. (AR 102-33.) In a written decision issued May 28, 2015, the ALJ found Plaintiff not disabled through the date last insured, December 31, 2013.[2] (AR 57-76.) Plaintiff requested review and submitted additional medical evidence to the Appeals Council. (See AR 401-03; see also AR 866-973.) On January 18, 2017, it denied review, finding that the additional evidence did not provide a basis for

_____

[1] Plaintiff apparently also applied for SSI at the same time (see AR 292-302), but his requests for reconsideration and a hearing concerned only his DIB application (AR 188, 198).

[2] Plaintiff had previously applied for DIB, on July 20, 2010. (See AR 57 (citing AR 134-53).) The application was denied, and the decision was affirmed by an ALJ on July 25, 2012. (AR 137-53.) Plaintiff never appealed. (See J. Stip. at 2.) The ALJ here found that Plaintiff had demonstrated changed circumstances since that final decision and thus that the Chavez presumption did not apply. (AR 57-58); see Lester v. Chater, 81 F.3d 821, 827-28 (9th Cir. 1995) (as amended Apr. 9, 1996) (citing Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988)). Defendant does not contend otherwise.

changing the ALJ's decision, and ordered that the new evidence be made part of the administrative record. (AR 1-6.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to

3

last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.    The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§ 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th
Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the
Commissioner must determine whether the claimant is currently
engaged in substantial gainful activity; if so, the claimant is
not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting his ability to do basic work
activities; if not, the claimant is not disabled and his claim
must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set
forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,
disability is conclusively presumed.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant

4

has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between July 26, 2012, the alleged onset date, and December 31, 2013, his date last insured. (AR 60.) At step two, he concluded that Plaintiff had the following severe impairments: "coronary artery disease post bypass procedure in 2007, cervical spine degenerative disc disease with radiculopathy, lumbar spine degenerative disc disease, and major depression disorder." (<u>Id.</u>) At step three, he determined that

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

his impairments did not meet or equal a Listing. (AR 60-61.)

At step four, the ALJ found that Plaintiff had the RFC to perform modified sedentary work:

> [He] can lift and/or carry 10 pounds occasionally and
> less than 10 pounds frequently; he can stand and/or walk
> for 2 hours out of an 8-hour workday with regular breaks;
> he can sit for 6 hours out of an 8-hour workday with
> regular breaks; he can occasionally balance, stoop,
> kneel, crouch, and crawl; he cannot climb ladders, ropes,
> or scaffolds; he cannot walk uphill; he can frequently
> reach overhead with the bilateral upper extremity; he can
> frequently handle and finger with the left (dominant)
> upper extremity; he can frequently perform fine and gross
> manipulation with the left (dominant) upper extremity; he
> should avoid concentrated exposure to excessive heat and
> cold; he should avoid concentrated exposure to dangerous,
> moving machinery; he cannot perform jobs requiring him to
> turn his neck and look behind; he is limited to simple
> tasks; and he cannot perform stressful jobs, such as
> taking complaints.

(AR 61-62.)

Based on the VE's testimony, the ALJ found that Plaintiff could not perform his past relevant work. (AR 68.) At step five, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, he could perform two representative jobs in the national economy. (AR 69.) Thus, he found him not disabled. (AR 69-70.)

**V.  DISCUSSION**

Plaintiff argues that the ALJ erroneously discounted his subjective symptom testimony and the opinions of treating physicians Wei Wah Kwok, Navid Geula, and Jose Caceres.[4]  (J. Stip. at 5-17, 26-31, 37-38.)  As discussed below, remand is not warranted.

     A.   <u>The ALJ Properly Evaluated Plaintiff's Subjective Symptom Testimony</u>

The ALJ found Plaintiff's testimony "not entirely credible." (AR 63.)  Plaintiff argues that the ALJ's "three rationales" for doing so — its inconsistency with his daily activities, his conservative treatment, and his failure to follow prescribed treatment — were insufficient.  (J. Stip. at 29.)  But Plaintiff is mistaken that reversal is warranted.  The ALJ's reliance on his admitted daily activities and demonstrated conservative treatment was proper; and Plaintiff hasn't challenged the ALJ's further finding that his subjective symptom statements were unsupported by the objective medical evidence.  (AR 63.)  As discussed below, those reasons were clear and convincing and supported by substantial evidence.  Remand is therefore unwarranted on this ground.

     1.   <u>Applicable law</u>

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight."  <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985) (as

---

[4] For efficiency, the Court addresses Plaintiff's arguments in an order different from that used by the parties.

amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[5] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in

---

[5] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 16, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however, and therefore does not apply. Still, the Ninth Circuit has clarified that SSR 16-3p

> makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to "evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.

Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's assessment of the claimant's subjective symptom statements is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

    2.   <u>Relevant background</u>

       a.  *Dr. Caceres*

Shortly before the relevant period, on April 26, 2012, Plaintiff underwent his third stress echocardiogram with Dr.

Caceres, his cardiologist.[6] (AR 514-15; <u>see also</u> AR 525 (Oct. 2010: stress echocardiogram with Dr. Caceres), 521 (Oct. 2011: same).) Plaintiff exercised for nearly 11 minutes until fatigue, shortness of breath, and chest pain and achieved a maximum heart rate of 170, or "97% of [his] predicted maximal heart rate." (AR 514-15; <u>see also</u> AR 525 (Oct. 2010: exercised for 10 minutes and reached "170 bpm," or "96%" of maximum heart rate), 521 (Oct. 2011: exercised for 12 minutes and reached "164 bpm," or "93%" of maximum heart rate).) He had "good exercise tolerance for [his] age" and "normal blood pressure and heart rate responses to stress." (AR 515.) "Echo images" during testing indicated that he had "new regional wall motion abnormalities" in his heart, including hypokinesis and dyskinesis of his anterior and lateral walls.[7] (<u>Id.</u>; <u>see also</u> AR 525 (Oct. 2010: similar findings), 521 (Oct. 2011: similar findings).) Dr. Caceres reviewed the results with Plaintiff in May 2012, educated him on diet, weight control, cholesterol, exercise, and smoking, and prescribed medication. (AR 485-86.)

After July 26, 2012, the beginning of the relevant period, Plaintiff complained of fatigue and palpitations associated with chest pain. (<u>See</u> AR 483-84 (Oct. 2012), 481-82 (Dec. 2012), 479-

---

[6] According to Dr. Caceres, Plaintiff had a "long-standing" history of coronary-artery disease. (<u>See</u> AR 857.) In 2007, he had a heart attack and underwent quadruple coronary-artery-bypass graft surgery in which two grafts were placed in his heart. (<u>Id.</u>) Dr. Caceres apparently began treating Plaintiff two years later, in 2009. (<u>See</u> AR 759.)

[7] Hypokinesis is diminished or slow movement. <u>See</u> <u>Stedman's Medical Dictionary</u> 861 (27th ed. 2000). Dyskinesis is the impairment of voluntary movement. <u>See</u> <u>id.</u> at 553.

80 (Jan. 2013).)  On January 23, 2013, Dr. Caceres performed a left-heart catheterization and selective coronary arteriography "to guide further therapy."[8]  (AR 856-58.)  He found a "normal" ejection fraction of "62 percent"[9] and diagnosed Plaintiff with "[r]ecurrent" angina pectoris,[10] myocardial ischemia, coronary-artery disease, ischemic cardiomyopathy,[11] and hypertensive heart disease.  (AR 856, 858.)  Dr. Caceres recommended only that Plaintiff, who was a "heavy cigarette smok[er]" (AR 857), "quit smoking," "optimize his medical therapy," and "have enhanced external counterpulsation therapy"[12] (AR 858).

[8] Cardiac catheterization is an imaging procedure used to evaluate heart function and is not considered surgery because no large incision is used to open the chest.  See Cardiac Catheterization, Cleveland Clinic, https:// my.clevelandclinic.org/health/diagnostics/16832-cardiac-catheterization (last updated Sept. 2013).  A coronary arteriograph or angiogram uses x-ray imaging to see a heart's blood vessels.  See Coronary Angiogram, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ coronary-angiogram/about/pac-20384904 (last updated Mar. 24, 2018).

[9] Ejection fractions measure how much blood is pumped from the left ventricle of the heart.  See Ejection Fraction, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/ 17069-heart-failure-understanding-heart-failure/ejection-fraction (last updated Oct. 2016).  An ejection fraction of "55% to 70%" indicates normal pumping ability and heart function.  Id.

[10] Angina pectoris is the medical term for chest pain, usually caused by coronary disease.  See Stedman's Medical Dictionary 80 (27th ed. 2000).

[11] Ischemic cardiomyopathy occurs when the heart muscle is weakened by a heart attack or coronary-artery disease.  See Ischemic Cardiomyopathy, Healthline, https://www.healthline.com/ health/ischemic-cardiomyopathy (last updated Jan. 26, 2018).

[12] Enhanced external counterpulsation therapy is a noninvasive outpatient treatment used to relieve chest pain by increasing blood flow in the heart.  See Heart Disease and EECP for Chronic Angina, WebMD, https://www.webmd.com/heart-disease/

Plaintiff continued to complain of chest pain in 2013.  (See

AR 477-78 (Feb. 2013), 453-54 (Apr. 2013), 472-73 (July 2013).)

In March of that year, an echocardiogram revealed a 73 percent

ejection fraction and other normal results, along with "trace"

mitral and tricuspid regurgitation.[13]  (AR 457-58.)  In July,

Plaintiff reported smoking 10 cigarettes a day (AR 472), and Dr.

Caceres, on his treatment report, checked boxes under "p[atient]

e[ducation]" for diet, weight control, cholesterol, exercise,

smoking, and medication (AR 473), apparently having discussed

those issues with Plaintiff.

In February 2014, after Plaintiff's date last insured, Dr.

Caceres completed a "cardiac impairment questionnaire."  (AR 759-

64.)  He assessed Plaintiff with NYHA Class III heart failure[14]

(AR 759) and noted that his chest pain, fatigue, shortness of

breath, and palpitations were caused by emotional stress and

guide/treating-chronic-angina-eecp (last updated Nov. 3, 2016).

[13] Mitral regurgitation occurs when the mitral valve of the heart does not completely close and blood flows backward into the upper heart chamber.  See Mitral Valve Regurgitation, MedlinePlus, https://medlineplus.gov/ency/article/000176.htm (last updated Apr. 30, 2018).  Tricuspid regurgitation occurs when the tricuspid valve does not completely close and blood flows backward from the lower-right heart chamber to the upper-right heart chamber.  See Tricuspid Regurgitation, MedlinePlus, https://medlineplus.gov/ency/article/000169.htm (last updated Apr. 30, 2018).

[14] The New York Heart Association places patients in one of four categories based on how much their heart condition limits them during physical activity.  See Classes of Heart Failure, Am. Heart Ass'n, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last updated May 8, 2017).  The Class III category denotes "[m]arked limitation of physical activity," "[c]omfortable at rest," and "[l]ess than ordinary activity causes fatigue, palpitation, or dyspnea."  Id.

physical exertion (AR 761).  He opined that Plaintiff could sit,
stand, or walk for only one hour in an eight-hour workday (AR
761) and lift and carry only up to 10 pounds occasionally (AR
761-62).  He would likely be absent from work more than three
times a month, and his concentration and attention would be
frequently interrupted by his symptoms.  (AR 762.)  He was
incapable of even low-stress jobs (id.) and needed to avoid
temperature extremes, heights, and pushing and pulling (AR 763).

Throughout the rest of 2014, Plaintiff saw Dr. Caceres six
times, complaining at each appointment of recurring chest pain,
palpitations, and shortness of breath.  (See AR 663-65 (July
2014), 659-62 (Aug. 2014), 655-58 (Sept. 2014), 651-54 (Oct.
2014), 647-50 (Nov. 2014), 686-89 (Dec. 2014).)  His angina, he
reported, "usually occur[ed] when walking 1-2 level blocks and/or
climbing 1 flight of stairs at a normal pace under normal
conditions."  (AR 663, 659, 655, 651, 647, 686.)  On examination,
Plaintiff's condition was normal: he had "normal" breath sounds,
"[r]egular" heart sounds, "[n]ormal" muscle tone and strength,
and "[n]ormal" walking and coordination, among other things, and
Dr. Caceres consistently "[e]ncouraged [Plaintiff] to stop
smoking."  (AR 664-65, 660-61, 656-57, 652-53, 648-49, 687-88.)

Such findings continued into 2015.  (See AR 682-85 (Jan.
2015), 675-77 (Feb. 2015).)  A January 2015 echocardiogram
revealed normal results, including an ejection fraction of 55
percent, but Plaintiff continued to demonstrate "trace" mitral
and tricuspid regurgitation.  (AR 680-81.)  In a stress
echocardiogram that same month — more than a year after his date
last insured — Plaintiff exercised for eight minutes until

13

fatigue and shortness of breath (but not chest pain) and reached a heart rate of 133, or "77% of [his] predicted maximal heart rate." (AR 678-79.) He had "very good" exercise tolerance for his age and "normal" blood-pressure and heart-rate responses to stress. (AR 679.) "Echo images" during testing revealed "new regional wall motion abnormalities," including hypokinesis of his septal and inferior walls and dyskinesis of his septal, lateral, and inferior walls, "suggestive of ischemia." (Id.)

In February 2015, Dr. Caceres noted that Plaintiff "continue[d] smoking despite patient education and multiple trials for him to discontinue smoking." (AR 693; see also AR 692 (patient still "smoking heavily").) An x-ray of Plaintiff's chest revealed "[n]o evidence of acute cardiopulmonary disease." (AR 646.) And a left-catheterization and coronary-arteriography procedure that month indicated coronary-artery disease but "open" grafts and a 65 percent ejection fraction. (AR 645, 691-93.) Based on those findings, Dr. Caceres recommended medical therapy and enhanced external counterpulsation. (AR 693.) Plaintiff, he found, was "not amenable" to further coronary-artery-bypass graft surgery or percutaneous coronary intervention based in part on his "open" veins and grafts and his failure to stop smoking. (Id.)

b. *Drs. Geula and Kwok*

Dr. Geula, an osteopathic physician, apparently began treating Plaintiff in 2010. (See AR 765.) His earliest treatment notes of record, however, are from September 2012. (See AR 427-29.) At that time, Plaintiff complained of "left shoulder pain with occ[asional] numbness and tingling," which had

14

been ongoing for years but "recently bec[a]me worse." (AR 427.)
On examination his left shoulder demonstrated "normal" movement,
but his left acromioclavicular joint showed tenderness on
palpation. (AR 428.) An x-ray of his left shoulder a few days
later was "unremarkable." (AR 445.) But a left-shoulder MRI in
December 2012 revealed Type II lateral acromion[15] and "[m]ild"
supraspinatus tendinopathy. (AR 443-44.) In January 2013, based
on the MRI findings, Dr. Geula referred Plaintiff to orthopedics
(AR 418-19), which apparently recommended a "neuro and pain
[management] eval[uation]" (AR 415 (Mar. 2013)). Throughout
2013, Plaintiff complained of neck and back pain. (AR 412-14
(May 2013), 532-34 (July 2013), 529-31 (Aug. 2013), 589-91 (Nov.
2013).) And Dr. Geula started him on narcotic pain medication,
specifically, hydrocodone-acetaminophen and "Tylenol #3"[16] (AR
532-34 (July 2013), 529-31 (Aug. 2013), 589-91 (Nov. 2013)),
though his pain "[wasn't] being resolved" with the Tylenol (AR
532; see also AR 412 ("Taking tylenol without good relief.")).

In February 2014, after the relevant period, Dr. Geula
completed an impairment questionnaire. (AR 765-69.) He
indicated that Plaintiff's primary symptoms were "daily" neck and
back pain. (AR 766.) He found that Plaintiff could sit two
hours in an eight-hour workday, for no longer than "15-30

---

[15] Type II acromion is curvature of the shoulder bone, which
may cause shoulder impingement and pain. See Acromion, Prime
Health Channel, https://www.primehealthchannel.com/acromion.html
(last updated Apr. 28, 2011).

[16] Tylenol #3 contains acetaminophen and codeine, a narcotic
analgesic, and is used to relieve mild to moderate pain. See
Acetaminophen and Codeine, MedlinePlus, https://medlineplus.gov/
druginfo/meds/a601005.html (last updated Mar. 15, 2018).

mi[nutes]" at a time, and could return to a seated position after "5-10 mi[nutes]" of moving around. (AR 767.) He could also stand or walk for one hour in an eight-hour workday. (Id.) He could lift five pounds frequently and up to 20 pounds occasionally and could carry five pounds frequently and up to 10 pounds occasionally. (Id.) He had "significant limitations" reaching, handling, and fingering. (AR 768.) With his left arm and hand he could grasp, turn, and twist objects, do fine manipulations, and reach "occasionally"; with his right, he could do the same but "frequently." (Id.) His symptoms would "occasionally" interfere with his attention and concentration and cause him to be absent from work more than three times a month. (AR 768-69.) When asked how "far back" his assessed limitations applied, Dr. Geula said July 26, 2012, "according to Plaintiff," the same date that Plaintiff had become eligible for benefits given the prior denial. (AR 769.)

In April 2013, Plaintiff was seen by a neurological surgeon for left-shoulder and chest pain. (AR 408-10.) On examination, Plaintiff's left shoulder demonstrated "some tenderness," but his left arm had "very good passive range of motion." (AR 409.) Although lateral rotation of his neck was "moderate[ly] decrease[d]," neck extension was "only mild[ly] decrease[d]" and he was otherwise "normal." (Id.) All of his major muscles in all extremities showed "5/5" strength. (Id.) A February 2013 MRI of Plaintiff's cervical spine was reviewed. (Id.) It revealed "moderate left neural foraminal narrowing" caused by a disc herniation, some "mild disc space narrowing," "disc degeneration," and a "disc bulge." (AR 441-42.) The surgeon

16

found that some of Plaintiff's reported symptoms were "not typical of cervical radiculopathy," recommended "conservative[]" treatment, and suggested that he try an "epidural injection to see if it help[ed]." (AR 409-10.)

Plaintiff received another neurological consultation in May 2013. (AR 446-49.) On examination, he demonstrated full range of motion in his neck, with "slight discomfort to rotation," "mild" tenderness and spasm to palpation in his right-upper trapezius, full range of motion and normal strength in each of his extremities, and a "[n]ormal" back. (AR 447-48.) After reviewing his February 2013 cervical-spine MRI, the neurologist noted the "gross abs[]ence of neurological motor or sensor[y] impairment" and recommended a nerve-conduction study "to further determine left-arm neuropathy." (AR 448.) An EMG study was not conducted until March 2015, 15 months after Plaintiff's date last insured, and revealed evidence of left-arm radiculopathy "that does correspond with [Plaintiff's] symptoms." (AR 79.)

In July 2013, Plaintiff visited a hospital emergency room with complaints of "[n]eck swelling" and neck and shoulder pain. (AR 566.) He reported that his symptoms were aggravated by movement but "alleviated by hydrocodone" and "remaining still." (Id.) On examination, his neck exhibited "moderate[ly]" "limited range of motion" but was externally "no[r]mal" and showed no "vertebral tenderness," "focal neurologic deficit," or "distracting injury." (AR 568.) His extremities demonstrated "[f]ull, normal range of motion," "intact" neurovascular systems, and "no cyanosis." (Id.) His back had "[f]ull range of motion" and no spinal or costovertebral tenderness. (Id.) And his gait

was "steady" and deep tendon reflexes "normal." (Id.)  His

February 2013 MRI was reviewed, and he was diagnosed with

cervical radiculopathy and myofascial cervical strain.  (AR 569.)

He was treated with various medications, including Dilaudid,[17]

and was then discharged in "[s]table condition" because his

symptoms had "markedly improved after treatment."  (Id.)

Pain-management specialist Kwok began treating Plaintiff in

September 2013 for neck and left-arm pain associated with

numbness and tingling in his left hand and weakness in his left

upper extremity.  (AR 630-32.)  On examination, Plaintiff's

strength, coordination, reflexes, and gait were "normal," but his

cervical spine demonstrated "pain on palpation" and with

extension and lateral rotation.  (AR 631.)  Dr. Kwok diagnosed

him with cervical radiculopathy and started him on gabapentin[18]

to treat it, though he was already taking Vicodin.  (Id.)  Dr.

Kwok suggested steroid injections for "diagnostic and therapeutic

purposes," but Plaintiff "want[ed] to hold off on interventions

pending response" to the medical therapy.  (AR 631-32.)  By

November 2013, however, after unsuccessful trials with gabapentin

(AR 628) and later Lyrica[19] (AR 626), he agreed to a steroid

---

[17] Dilaudid is the brand name of hydromorphone, a narcotic
analgesic used to relieve severe pain.  See Hydromorphone,
MedlinePlus, https://medlineplus.gov/druginfo/meds/a682013.html
(last updated Mar. 15, 2018).

[18] Gabapentin is an anticonvulsant used to control seizures
and can be used to relieve pain.  See Gabapentin, MedlinePlus,
https://medlineplus.gov/druginfo/meds/a694007.html (last updated
Nov. 15, 2017).

[19] Lyrica is the brand-name version of pregabalin, an
anticonvulsant used to relieve neuropathic pain.  See Pregabalin,
MedlinePlus, https://medlineplus.gov/druginfo/meds/a605045.html

injection (AR 627).  That month, Dr. Kwok also noted tenderness to palpation and decreased range of motion with pain in Plaintiff's lumbar spine.  (AR 626; <u>see also</u> AR 550-51 (Nov. 2013 x-ray of lumbar spine revealing "limbus deformity (congenital)," "no significant subluxations" on lateral flexion and extension, and "[m]ild degenerative chronic disc disease").)

Dr. Kwok administered the epidural steroid injection in December 2013.  (AR 617.)  At a follow-up appointment in January 2014, Plaintiff reported that the injection provided "mild transient relief," but afterward he experienced "higher pain levels compared to prior to the procedure."  (AR 615.)  He was advised to continue using Vicodin and was referred to physical therapy and a surgical reevaluation.[20]  (AR 616.)

Later in January 2014, Dr. Kwok completed an impairment questionnaire.  (AR 608-12.)  Plaintiff's primary symptoms were neck, back, and left-arm pain that was aggravated by "bending, lifting, coughing, sneezing, defecation, walking, [and] prolonged sitting and standing."  (AR 609.)  He could sit, stand, or walk for less than an hour during an eight-hour workday and could sit for only 15 minutes at a time before needing to move around.  (AR 610.)  He could return to sitting after five minutes.  (<u>Id.</u>)  He could lift and carry only five pounds and only "occasionally" (<u>id.</u>), and he had "significant limitations" in reaching, handling, and fingering (AR 611).  He could never use his left

_____

(last updated Dec. 15, 2017).

[20] Plaintiff apparently scheduled only one physical-therapy appointment and "missed" it because of "issues with transportation."  (AR 745.)

19

arm and hand for fine manipulations, reaching, or grasping, turning, or twisting objects, but he could use his right arm and hand "frequently" for the same actions. (Id.) Because of his symptoms, Plaintiff's attention and concentration would be "frequently" impaired, he would have to take unscheduled breaks "once-twice per hour" for "5-10 minutes" at a time, and he would have to miss work more than three times a month.[21] (AR 611-12.) At the end of the questionnaire, Dr. Kwok indicated that these limitations applied as "far back" as July 26, 2012, "per patient report," the same date Plaintiff became eligible for benefits. (AR 612.)

Plaintiff saw Dr. Kwok a year later, in January 2015, for neck, arm, and back pain. (AR 745-46.) He was again referred to physical therapy (AR 746) but again didn't follow up, this time because of claimed "cardiac issues" (AR 743). In February 2015, at Plaintiff's request, he was referred for a "second spine surgical opinion." (AR 744; see also AR 972 (Dr. Kwok noting that Plaintiff was scheduled for a "neurosurgical eval[uation] for c-spine" on July 20, 2015, though no such evaluation is in record).) An x-ray of Plaintiff's cervical spine ordered in May 2015 by Dr. Kwok revealed some "disc narrowing" but was "otherwise normal." (AR 84.)

---

[21] Dr. Kwok completed another impairment questionnaire in July 2015, reiterating the same functional limitations except that Plaintiff could then only "occasionally" reach with his right arm (but could still "frequently" use his right arm for all other actions). (See AR 972-73.)

c. *Testifying Medical Examiner*

Medical expert John Morse, a cardiologist (see AR 272-75), reviewed Plaintiff's medical records and testified at the May 2015 hearing (AR 107-14). He found that Plaintiff had separate physical-health issues relating to his heart and his spine. (AR 107, 109.) Regarding his heart, Dr. Morse noted Plaintiff's history of coronary-artery disease and coronary bypass procedure, discussing in particular his stress echocardiograms and catheterization procedure. (AR 107-08.) The stress test from September 2011 indicated "subtle abnormality at peak exercise," but Plaintiff "certainly had excellent exercise" and was "fatigue limit[ed] at best" given that the test "did not induce angina." (AR 108.) Although he "didn't do nearly as well" on his most recent stress test, in January 2015, he still had "ten minutes of exercise" and did "reasonably well." (Id.) "[S]tress echoes," he stated, "can be subject to interpretation." (Id.) And Dr. Morse believed that based on the testing of record, Plaintiff's "left ventricular function remain[ed] normal." (Id.)

Plaintiff's 2015 catheterization, which Dr. Morse "reviewed . . . in detail," also suggested that his "ventricular function" was "reasonably good." (AR 108-09.) All of Plaintiff's saphenous vein grafts were "widely patent," and his left ventricular function remained "normal." (AR 108.) There was "some evidence" of "small vessel disease, which [was] probably responsible for the finding on his echocardiogram," but he was not a candidate for repeat angioplasty or coronary bypass surgery. (Id.) He was a "good candidate for ongoing medical treatment." (Id.) Dr. Morse did not believe he was NYHA Class

21

III status but thought "Class II would be more appropriate."[22] (AR 110.)

Regarding his cervical spine, Dr. Morse noted MRI evidence of degenerative disc disease and a 2013 neurological examination as to which the physician "felt that his symptoms were compatible with degenerative disc and joint disease of the C-spine." (AR 109.) But the neurological exam, Dr. Morse explained, was "entirely normal," with "no sensory or motor deficits" found. (Id.) Dr. Morse also noted "lesser" issues with Plaintiff's lumbar spine, as suggested by x-rays showing "minimal disease" but without "much positive objective data." (Id.) Dr. Morse opined that he "probably ha[d] some degenerative joint disease" but that there "really [was] not much by x-ray or by physical examination" to fully support it. (Id.)

Dr. Morse opined that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally; sit, stand, and walk six hours in an eight-hour workday;[23] occasionally use ramps, stairs, ladders, ropes, and scaffolds; balance without limitation; frequently stoop, bend, kneel, crouch, and crawl; and frequently

---

[22] NYHA Class II heart failure denotes "[s]light limitation of physical activity," "[c]omfortable at rest," and "[o]rdinary physical activity results in fatigue, palpitation, [or] dyspnea (shortness of breath)." See Classes of Heart Failure, Am. Heart Ass'n, http://www.heart.org/HEARTORG/Conditions/HeartFailure/ AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last updated May 8, 2017).

[23] Dr. Morse seemed to suggest that Plaintiff could do these things in combination only for a total of six hours a day, not six hours each, meaning that Plaintiff could not work for an entire eight-hour day. Because the statement was not entirely clear and Plaintiff has not raised the issue, the Court assumes Dr. Morse meant sit, stand, or walk for six hours each.

reach overhead with both arms. (AR 110-11.) Moreover, he should avoid concentrated exposure to heat, cold, hazardous machinery, and unprotected heights. (AR 111.) Dr. Morse declined to give an opinion on "manipulative" limitations because he "didn't really take into consideration the findings of [Plaintiff's 2015] EMG," which was conducted more than a year after the relevant period, but he stated that that EMG "confirms his degenerative disease of the cervical spine" and, "assuming that he does have radiculopathy," supported his overhead-reaching limitation to "frequent." (AR 111-12.)

Upon being questioned by Plaintiff's attorney, Dr. Morse further testified that Plaintiff's cardiac condition, specifically his "small vessel disease," would cause "angina from time to time" even though he experienced no angina on the two recent stress-echo examinations. (AR 112.) The symptoms would be "well-controlled on his medication," Dr. Morse stated, and "at a light level of activity, he should be way under his angina threshold given his coronary anatomy." (AR 112-13.) This conclusion was supported by evidence that his grafts were "widely patent," his left ventricle was "normal," and his echocardiograms looked "good." (AR 113.)

Regarding his other symptoms, Dr. Morse stated that "[h]is neck pain [was] consistent with his MRI findings." (Id.) There were "enough imaging findings to explain his pain," and on examination "there [was] some pain and limited range of motion with his neck." (AR 114.) Dr. Morse noted, however, that there was not "any evidence of any deficits." (Id.)

### d.   *State-Agency Consultants*

In August 2013 and March 2014, Plaintiff's medical records were reviewed by state-agency consultants and internal-medicine practitioners D. Chan and Rudolf Titanji, respectively. (See AR 154-80.) Both doctors found Plaintiff not disabled (AR 163, 179) and assessed the same functional limitations: he could "lift and/or carry" 20 pounds occasionally and 10 pounds frequently; "[s]tand and/or walk (with normal breaks)" six hours in an eight-hour workday; "[s]it (with normal breaks)" six hours in an eight-hour workday; "[p]ush and/or pull" without limitation; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds (AR 161, 176-77). Dr. Chan further opined that Plaintiff would have some environmental limitations, needing to avoid "moderate exposure" to humidity and extreme heat or cold as well as "all exposure" to "[h]azards (machinery, heights, etc.)." (AR 162.) He specifically would have to avoid "unprotected heights, heavy machinery, [and] uneven terrain." (Id.)

### e.   *Plaintiff's Statements*

At his May 7, 2015 hearing, Plaintiff testified that "around December . . . 2013" he was experiencing pain in his left arm, chest, and lower back. (AR 115.) His chest pain, he stated, was "chronic" (AR 118), as he experienced it "every couple of hours" "every day" (AR 119), even at rest (AR 119-20). He also testified to experiencing nausea, lightheadedness, and "shortness of breath" three or four times a week for "up to five minutes" (AR 120-21) as well as "[l]ow energy" and "fatigue" (AR 122). Looking down, moreover, caused him neck pain. (AR 127.)

24

During that same period, he testified, he "[o]ccasionally"
drove, lived with someone, made "ready-made" meals, "bathe[d]
[him]self," and did his own laundry and dishes; but he could walk
only one or two minutes without losing breath or "feeling chest
pains" and would feel pain lifting three pounds. (AR 116-17,
126-27.) He spent six hours during the daytime lying down. (AR
122.) He could sit for 10 minutes and stand for 20 minutes
before having to change position. (AR 126.) And after two
minutes of "light activities," such as "holding a pen," he would
experience numbness or shooting pain in his left hand (AR 124),
which was his dominant hand (AR 115).

A year and a half earlier, in October 2013, during a
consulting psychiatric examination, Plaintiff indicated that
"blockage in his coronary artery" was his "chief complaint" but
that he also had pain in his neck and left shoulder, numbness in
his hands and fingers, and depression and anxiety. (AR 544.) He
reported no history of drug or alcohol abuse but acknowledged
that he had been "smoking 10 cigarettes a day for more than 20
years."[24] (AR 545.) The consulting examiner noted that
Plaintiff had "adequate self-care skills of dressing, bathing,
eating, toileting, and safety precautions." (AR 546.) He
"clean[ed], r[an] errands, shopp[ed], and cook[ed]"; "watch[ed]
television and sports"; and "manage[d] his own money and pa[id]

_____

[24] A month later, in November 2013, Plaintiff was admitted
to a hospital emergency room for alcohol abuse, "with a recent
binge." (AR 552-59.) He had apparently been at a bar and was
pepper-sprayed in the face by a bouncer; he complained of "chest
pain" "at the scene." (AR 553.) His physical exam was "normal,"
however (AR 554), and he was discharged "symptom free" (AR 555).

bills." (Id.)  He had a driver's license but did not have a car;
he reported relying on "family and friends for transportation"
and could not "go to places by himself."  (Id.)

         3.  <u>Analysis</u>

    The ALJ found that Plaintiff's "medically determinable
impairments could reasonably be expected to cause [his] alleged
symptoms" but that his "statements concerning the intensity,
persistence and limiting effects of these symptoms [were] not
entirely credible." (AR 63.)  The ALJ provided three clear and
convincing reasons for doing so: Plaintiff's statements were
inconsistent with the "objective medical evidence," his
"activities of daily living," and his "conservative" treatment.
(AR 62-63.)  Any error in the ALJ's remaining reason — "fail[ure]
to comply with prescribed treatment recommendations" (AR 63) —
was harmless.

         a.  *Objective Medical Evidence*

    Inconsistency with objective medical evidence is a
"sufficient basis" for rejecting a claimant's subjective symptom
testimony.  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155,
1161 (9th Cir. 2008); <u>see</u> <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>,
169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between
[plaintiff's] testimony of subjective complaints and the
objective medical evidence in the record" as "specific and
substantial" reason undermining credibility).  Although a lack of
medical evidence "cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis." <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th
Cir. 2005); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th

2001) (citing § 404.1529(c)(2)).  The ALJ here found that
Plaintiff's complaints of "disabl[ing]" neck and back pain were
"not support[ed]" by the "objective medical evidence" (AR 63),
and Plaintiff raises no argument directly challenging that
finding (see generally J. Stip.).  Indeed, substantial evidence
supports the ALJ's reasoning.

Plaintiff alleged "shooting" neck and back pain that caused
problems with his left shoulder and numbness in his arms, hands,
and fingers.  (See, e.g., AR 115, 122, 544.)  During the relevant
period, however, physical examinations of Plaintiff's neck, back,
and upper extremities often yielded "normal" or "mild" results.
(See, e.g., AR 428 (Sept. 2012: "normal" left-shoulder movement),
409 (Apr. 2013: "very good passive range of motion" in left arm
and "5/5" strength in all major muscles and extremities), 447-48
(May 2013: full range of motion in neck and extremities,
"[n]ormal" back, and "gross abs[]ence of neurological motor or
sensorial impairment"), 568 (July 2013: full and "normal" range
of motion in extremities and back), 631 (Sept. 2013: "normal"
strength).)  Medical imaging demonstrated the same.  (See, e.g.,
AR 445 (Sept. 2012 left-shoulder x-ray "unremarkable"), 443-44
(Dec. 2012 left-shoulder MRI showing "[m]ild" tendinopathy), 550-
51 (Nov. 2013 lumbar-spine x-ray showing "[m]ild" degenerative
disc disease and "no significant subluxations" on lateral flexion
and extension); see also AR 84 (May 2015 cervical-spine x-ray
showing "disc narrowing" but "otherwise normal," results more
than 17 months after date last insured).)  And medical expert
Morse — whose opinion the ALJ gave "significant weight," a
finding also unchallenged by Plaintiff — found no evidence of

27

"any [neurologic] deficits."  (AR 114.)

Plaintiff similarly complained of "chronic" chest pain and associated symptoms of shortness of breath and fatigue.  (See, e.g., AR 118-20, 122, 544.)  But cardiovascular medical assessments frequently revealed "normal" or unremarkable findings.  (See, e.g., AR 856-58 (Jan. 2013: "normal" ejection fraction of 62 percent), 457-58 (Mar. 2013: "normal" ejection fraction of 73 percent), 447 (May 2013: "[r]egular" heart rate and rhythm and "[c]lear" breath sounds), 567-68 (July 2013: "[r]egular" heart rate and rhythm and "[n]o increased work of breathing"), 533 (July 2013: "[n]ormal" breath sounds and heart rate and rhythm), 631 (Sept. 2013: "Arterial strength: 2+ bilateral radial and brachial arteries"), 554 (Nov. 2013: "[r]egular" heart rate and rhythm and "[n]o increased work of breathing"); see also AR 680 (Jan. 2015, 13 months after date last insured: "normal" ejection fraction of 55 percent), 646 (Feb. 2015 x-ray revealing "[n]o evidence of acute cardiopulmonary disease"), 691-93 (Feb. 2015: "normal" ejection fraction of 65 percent).)[25]

---

[25] Plaintiff argues that the ALJ (and Defendant) cherry-picked evidence from the record to support his nondisability determination, selectively focusing on "only the most benign" findings and treatment notes.  (See J. Stip. at 16-17, 27.)  But as shown, the weight of the evidence suggested that Plaintiff's condition was not totally debilitating, and the ALJ's assessments, both as to Plaintiff's subjective symptom statements and the medical-opinion evidence, were supported by substantial evidence.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (ALJ properly discounts claimant's testimony when "supported by substantial evidence in the record"); Lester, 81 F.3d at 831 (ALJ may reject medical opinion when that determination is "supported by substantial record evidence" (emphasis in original) (citation omitted)).

In line with such findings, Plaintiff's condition was treated during the relevant period mostly with medication and physical therapy (although Plaintiff apparently never pursued the latter recommended treatment). (See, e.g., AR 858 (Dr. Caceres recommending only that Plaintiff "quit smoking," "optimize his medical therapy," and get "enhanced external counterpulsation therapy"), 616 (Dr. Kwok recommending physical therapy and pain medication), 634 (Dr. Geula prescribing only pain medication).) In fact, his cardiologist indicated that he was "not amenable" to more aggressive forms of treatment given his failure to stop smoking and his "open" veins and grafts (AR 693), and a neurosurgeon, after examining Plaintiff, recommended treating him only "conservatively" (AR 409-10). Thus, as the ALJ specified, Plaintiff had not received "the type of medical treatment one would expect for a totally disabled individual" (AR 63) who on occasion claimed his pain was a 10 out of 10 (see, e.g., AR 743) and said his chest pain occurred numerous times a day "every day" (AR 119-20); see Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of treatment in his credibility determination."); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (as amended) ("[Plaintiff's] claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received.").

To the extent Plaintiff's allegations of neck pain were consistent with findings of tenderness and limited range of motion in his neck (see, e.g., AR 428 (Sept. 2012), 409 (Apr. 2013), 566 (July 2013), 631 (Sept. 2013)), degenerative disc disease in his cervical spine (see, e.g., AR 441-42 (Feb. 2013)),

29

and radiculopathy (see AR 569 (July 2013), 631 (Sept. 2013); see also AR 79 (Mar. 2015)), the ALJ did not fully reject them. Dr. Morse testified that such medical evidence supported a limitation of only "frequent" overhead reaching (AR 111-12). The ALJ incorporated that limitation into the RFC. (AR 61 (RFC with "frequent" overhead reaching).) He also gave explicit consideration to Plaintiff's March 2015 EMG study by "restrict[ing] [him] to sedentary exertional work." (AR 67; see also AR 61 ("sedentary work" RFC with modifications), 79.) And he similarly gave partial credit to Plaintiff's "subjective complaints" by "further restrict[ing] [him] from walking uphill and turning his head back." (AR 67; see also AR 61-62 (RFC specifying that Plaintiff "cannot walk uphill" or "turn his neck and look behind"), 117, 127.) The ALJ's assessments in this regard were proper. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (ALJ does not err when he translates claimant's condition into "concrete restrictions available to him" and incorporates those limitations into RFC); see also Thomas, 278 F.3d at 958 ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."); Ackley v. Astrue, No. EDCV 11-1945-JEM, 2012 WL 2458139, at *5 (C.D. Cal. June 26, 2012) (affirming ALJ's adverse credibility determination when ALJ's decision "did not amount to a wholesale rejection of [p]laintiff's subjective complaints" and "reasonably accounted for [her] testimony" in RFC).

Thus, the ALJ correctly and only partially discredited

30

Plaintiff's subjective statements in light of the medical evidence.

b. *Activities of Daily Living*

An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with his daily activities.  See Molina, 674 F.3d at 1113.  "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Id. The ALJ here found that despite Plaintiff's subjective complaints of "disabling symptoms," he reported "normal activities of daily living" that undermined the "credibility of [his] allegations." (AR 62.)

For example, Plaintiff testified that "light activities," such as simply "holding a pen," caused "numbness" and "shooting" pain in his left, dominant hand and that he experienced pain lifting even three pounds.  (AR 115, 117-24.)  He also purportedly experienced "continuous" chest pain "every day," shortness of breath, low energy, and fatigue and had to lie down for at least six hours a day in addition to sleeping at night. (AR 118-20, 122.)  He had trouble walking, especially uphill, could walk only one or two minutes before losing breath or "feeling chest pains," and could sit for only 10 minutes and stand for only 20 minutes at a time.  (AR 117, 126.)

But as noted by the ALJ, he reported a number of daily activities that suggested he could engage in greater levels of function: he "dr[ove] occasionally, washe[d] [his] dishes, and bathe[d] himself," "clean[ed], r[an] errands, shop[ped], and

31

cook[ed]," and "exercise[d]" by "walking every day." (AR 62; see also AR 116-17 (May 2015 hearing testimony regarding daily activities), 421 (Nov. 2012: reporting to Dr. Geula that he "walk[ed] everyday for exercise"), 546 (Oct. 2013 report to consulting examiner regarding daily activities).) He also did his own laundry, had "adequate" self-care skills, watched television, managed his own money, and paid bills. (AR 126, 546.) Thus, Plaintiff's "normal" activities of daily living contradicted his claims of totally debilitating impairment. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (evidence that plaintiff's daily activities "contradicted [his] contentions about how debilitating his fatigue was" constituted "clear and convincing reason[] to reject [his] subjective testimony"); Presley-Carrillo v. Berryhill, 692 F. App'x 941, 945 (9th Cir. 2017) (discounting claimant's testimony concerning disabling nature of symptoms when it conflicted with evidence of daily activities); Fernandez v. Astrue, No. CV 09-00109 AGR, 2010 WL 1875522, at *3 (C.D. Cal. May 7, 2010) (plaintiff's daily activities supported discounting his subjective symptom statements when he was able to "walk two to three blocks," "take his children to school, do grocery shopping, pull out weeds, water plants, and work on his car").

Plaintiff objects that the daily walking exercise cited by the ALJ did not indicate that it was "sustained" or sufficiently "intens[e]" to discount his symptom testimony. (J. Stip. at 17, 27.) But Plaintiff's ability to exercise and withstand physical exertion was medically confirmed at multiple points throughout the record: his stress-test performances demonstrated that he had

"good" or "very good" exercise tolerance and cardiovascular responses to physical exertion. (See AR 515, 679.) Indeed, in April 2012, he exercised for nearly 11 minutes, presumably by walking on a treadmill (see AR 521, 525), before experiencing fatigue or chest pain (AR 514-15), and in January 2015, he demonstrated the same for eight minutes until he was tired, with no chest pain (AR 678-79). This was despite his claiming at the hearing that he could walk for only one or two minutes before losing breath or feeling chest pains. (AR 117.) Such findings were consistent with Plaintiff's other daily activities, as discussed above, undermining his allegations that he was totally disabled. See Molina, 674 F.3d at 1113.

### c. *Conservative Treatment*

The ALJ also discounted Plaintiff's subjective symptom testimony because his treatment was "limited to pain medications [and an] epidural steroid injection[]," "[t]here were no recommendations for more aggressive treatment, such as surgery," and what treatment he had received since the relevant date was "routine, conservative, and non-emergency." (AR 63.) The ALJ's reliance on this reason was proper and supported by substantial evidence. See Parra, 481 F.3d at 751.

Plaintiff's physical-health issues were treated primarily with medication. His heart condition, for example, was treated with "medical therapy" and recommendations that Plaintiff exercise, quit smoking, and manage his diet, weight, and cholesterol. (See, e.g., AR 484 (Oct. 2012), 482 (Dec. 2012), 480 (Jan. 2013), 858 (same), 478 (Feb. 2013), 454 (Apr. 2013), 473 (July 2013); see also AR 486 (May 2012), 665 (July 2014), 661

33

(Aug. 2014), 657 (Sept. 2014), 653 (Oct. 2014), 649 (Nov. 2014), 688 (Dec. 2014), 693 (Feb. 2015).)  And Dr. Caceres, Plaintiff's treating cardiologist, found that he was "not amenable" to more aggressive forms of treatment, such as surgery, in light of his "open" veins and grafts and failure to stop smoking.  (AR 693.)

His neck, back, and upper-extremity problems were treated with nonnarcotic medication, including gabapentin and Lyrica (e.g., AR 631 (Sept. 2013), 628 (Oct. 2013)), and narcotic medication, including Vicodin and Dilaudid (e.g., AR 534 (July 2013), 569 (same), 529 (Aug. 2013), 630 (Sept. 2013), 545 (Oct. 2013), 553 (Nov. 2013)).  He was at times recommended for physical therapy (see AR 616, 746), though no documentation of his ever attending such therapy appears in the record.  And a neurosurgeon in April 2013, after examining Plaintiff and reviewing a recent MRI of his cervical spine, specifically recommended only "conservative[]" treatment.  (AR 409-10.) Although he received one epidural injection, in December 2013, he received no other during the relevant period or afterward.  (See AR 617.)  Moreover, although Plaintiff apparently had a July 2015 appointment to reconsider neurosurgery (see AR 972), that was well after his date last insured, and he underwent no surgery at any point during the relevant period.

Plaintiff's treatment was conservative.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) ("physical therapy and the use of anti-inflammatory medication, a [TENS] unit, and a lumbosacral corset" qualified as conservative treatment); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (narcotic medication, physical therapy, and

single injection amounted to "conservative treatment"); <u>Rodriquez</u>
<u>v. Colvin</u>, No. CV 14-03731 AJW, 2016 WL 552648, at *2 (C.D. Cal.
Feb. 10, 2016) (treatment "conservative" when Plaintiff with
diabetes, back pain, and arthritis was treated with medications,
including gabapentin).  Thus, the ALJ properly discounted
Plaintiff's subjective symptom testimony on this ground.

Even assuming the ALJ erred, <u>see Lapeirre-Gutt v. Astrue</u>,
382 F. App'x 662, 664 (9th Cir. 2010) ("A claimant cannot be
discredited for failing to pursue non-conservative treatment
options where none exist."); <u>Soltero De Rodriquez v. Colvin</u>, No.
CV 14-05765-RAO, 2015 WL 5545038, at *4 (C.D. Cal. Sept. 18,
2015) ("[T]he use of narcotic medication in conjunction with
other treatments is generally viewed as non-conservative
treatment."), any error was harmless because the ALJ provided two
sufficient rationales for rejecting Plaintiff's testimony —
inconsistency with the medical record and with his activities of
daily living — as already discussed, <u>see Larkins v. Colvin</u>, 674
F. App'x 632, 633 (9th Cir. 2017) ("[B]ecause the ALJ gave
specific, clear and convincing reasons for finding [plaintiff]
not fully credible, any error in the additional reasons the ALJ
provided for finding [her] not fully credible was harmless."
(citing <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1197
(9th Cir. 2004))).

              d.   *Noncompliance with Prescribed Treatment*

The ALJ further discounted Plaintiff's symptom statements
because he "failed to comply with prescribed treatment
recommendations"; specifically, he continued to "smoke tobacco
cigarettes" despite being "advised to abstain from smoking in

light of his heart condition." (AR 63; see also AR 692-93 (Dr.
Caceres noting that Plaintiff continued smoking heavily "despite
patient education and multiple trials for him to discontinue
smoking").) Substantial evidence supports the ALJ's reasoning.
(Compare AR 858 (Jan. 2013: Dr. Caceres advising that Plaintiff
"quit smoking"), and AR 473 (July 2013: Dr. Caceres educating
Plaintiff regarding "smoking"), with AR 409 (Apr. 2013: Plaintiff
reporting smoking "15 cigarettes a day"), and AR 472 (July 2013:
"10 cig[arettes]/ day"), and AR 630 (Sept. 2013: "11-20"
"cigarettes a day").) Plaintiff, moreover, has offered no
explanation for his noncompliance.[26]

An ALJ may properly consider a claimant's unexplained
failure to follow prescribed treatment in discounting his
subjective symptom testimony. See Tommasetti, 533 F.3d at 1039.
"[I]f a claimant complains about disabling pain but fails to seek
treatment, or fails to follow prescribed treatment, for the pain,
an ALJ may use such failure as a basis for finding the complaint
unjustified or exaggerated[.]" Chaudhry v. Astrue, 688 F.3d 661,
672 (9th Cir. 2012) (first alteration in original) (citing Orn v.
Astrue, 495 F.3d 625, 638 (9th Cir 2007)); see also Hurter v.
Astrue, 465 F. App'x 648, 650 (9th Cir. 2012) (upholding ALJ's

---

[26] Plaintiff also never pursued physical therapy despite its
being recommended on more than one occasion. (See, e.g., AR 616,
746.) He canceled one scheduled session because of
"transportation" issues (AR 745) and didn't follow up another
time because of "cardiac issues" (AR 743). These unsubstantiated
reasons were Plaintiff's own self-reports and do not excuse his
failure to follow through with doctor-recommended treatment.
Indeed, Dr. Caceres, Plaintiff's cardiologist, repeatedly
recommended that he exercise (see, e.g., AR 473, 486), and
nothing in the record indicates that he was advised not to pursue
physical therapy on account of his heart.

adverse credibility assessment in part because plaintiff "continue[d] to smoke despite warnings from her doctors regarding its impact on her lung condition"). Plaintiff's reports of severe chest pain seem incompatible with apparently not even attempting to stop smoking.[27]

But when a claimant's failure to follow prescribed treatment involves quitting smoking, published Ninth Circuit law has disfavored that in dictum as a reason for discrediting the claimant's testimony. See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) ("It is certainly possible that [plaintiff] was so addicted to cigarettes that she continued to smoke even in the face of debilitating [impairments]." (first alteration in original)). Accordingly, the ALJ's reliance on Plaintiff's failure to follow treatment by quitting smoking, though supported by substantial evidence, may have been incorrect as a matter of law. See Keenan v. Colvin, No. 2:13-cv-1832-EFB, 2015 WL 1387955, at *8 (E.D. Cal. Mar. 25, 2015) (finding that "plaintiff's failure to quit smoking as a basis for discounting his credibility [was] questionable" given addictive nature of smoking (citing Bray, 554 F.3d at 1227); Runkle v. Astrue, No. ED CV 07-571-PJW, 2008 WL 4447679, at *2 (C.D. Cal. Sept. 30, 2008) (finding plaintiff's failure to quit smoking not "an indication of her lack of credibility" in part because "cigarette smoking is a very difficult habit to break").

---

[27] Plaintiff is thus incorrect that "there is simply no logical connection between the inability to quit smoking and the credibility of [Plaintiff's] claim of disabling limitations." (J. Stip. at 31.)

1    In any event, although the ALJ may have erred as to this

2 reason, he provided other clear and convincing reasons for

3 discounting Plaintiff's subjective symptom testimony, as

4 discussed above, and thus any error was harmless.  See Bray, 554

5 F.3d at 1227 (finding that "ALJ's reliance on [plaintiff's]

6 continued smoking, even if erroneous, amount[ed] to harmless

7 error" because "the ALJ presented four other independent bases

8 for discounting [his] testimony"); see also Larkins, 674 F. App'x

9 at 633.  Remand is therefore unwarranted on this ground.

10        B.    The ALJ Properly Evaluated the Medical Opinion Evidence

11        Plaintiff argues that the ALJ's reasons for rejecting Drs.

12 Geula's and Kwok's opinions were neither "clear and convincing"

13 nor "specific and legitimate."  (J. Stip. at 15-17, 27.)  He also

14 failed to even mention Dr. Caceres's February 2014 opinion and

15 thus committed "harmful legal error," Plaintiff contends.  (Id.

16 at 15, 26.)

17             1.   Applicable law

18        Three types of physicians may offer opinions in Social

19 Security cases: those who directly treated the plaintiff, those

20 who examined but did not treat the plaintiff, and those who did

21 neither.  Lester, 81 F.3d at 830.  A treating-source opinion is

22 generally entitled to more weight than an examining one, and an

23 examining-source opinion is generally entitled to more weight

24 than a nonexamining one.  Id.; see § 404.1527(c)(1).[28]  This is

25

26        [28] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017.  When, as
27 here, the ALJ's decision is the final decision of the
Commissioner, the reviewing court generally applies the law in
28 effect at the time of the ALJ's decision.  See Lowry v. Astrue,

38

so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen, 80 F.3d at 1285. But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended). This is especially true when that doctor was subject to questioning by plaintiff's counsel. See Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. § 404.1527(e).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle, 533 F.3d at 1164. When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. Magallanes, 881 F.2d at 751; see Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or

---

474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 404.1527 are to the version in effect from August 24, 2012, to March 26, 2017.

examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 404.1527(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. § 404.1527(e).

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957; accord Batson, 359 F.3d at 1195. An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. Magallanes, 881 F.2d at 755. "[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

2. <u>Analysis</u>

a. *Drs. Geula and Kwok*

The ALJ attributed "little weight" to Drs. Geula's and Kwok's opinions, both of which assessed Plaintiff with highly restrictive functional limitations. (AR 67; <u>see also</u> AR 608-12, 765-69, 972-73.) Because those opinions were contradicted by the less restrictive opinions of the testifying medical expert and

40

state-agency reviewers (see AR 110-12, 161-62, 176-77) — as well as by each other in some respects — the ALJ was required to provide only a "specific and legitimate reason" for rejecting them. See Carmickle, 533 F.3d at 1164. He did so.

First, the ALJ found that the doctors' "limitations in lifting, carrying, standing, and walking" were "not consistent with the objective evidence." (AR 67.) The ALJ specifically discussed the "no-to-mild findings from EKGs and stress tests" and the "[lack of] evidence of neurological defects." (Id.) The ALJ's reasoning was proper and supported by substantial evidence. See Tommasetti, 533 F.3d at 1041 (inconsistency with medical record "specific and legitimate" reason for rejecting treating-source opinion).

As already discussed above, physical examinations throughout the relevant period indicated that Plaintiff's condition was mostly normal, both with regard to his heart (see, e.g., AR 447 (May 2013), 567-68 (July 2013), 533 (July 2013), 631 (Sept. 2013), 554 (Nov. 2013)) and his neck, back, and upper extremities (see e.g., AR 428 (Sept. 2012), 409 (Apr. 2013), 447-48 (May 2013), 568 (July 2013), 631 (Sept. 2013)). Medical imaging often revealed "no-to-mild" findings, as described by the ALJ. (See, e.g., 443-44 (Dec. 2012), 550-51 (Nov. 2013); see also AR 646 (Feb. 2015), 84 (May 2015).) And medical testing, such as the stress echocardiograms and catheterization completed by Dr. Caceres, produced similarly unremarkable results. (See, e.g., AR 856-58 (Jan. 2013), 457-58 (Mar. 2013); see also AR 680 (Jan. 2015), 691-93 (Feb. 2015).)

Dr. Kwok found that Plaintiff could lift and carry at most

41

five pounds and only occasionally (AR 610), whereas Dr. Geula assessed that he could lift five pounds frequently and up to 20 pounds occasionally and carry five pounds frequently and up to 10 pounds occasionally (see AR 767); these limitations were specifically undermined by examination findings of Plaintiff's "normal" strength and range of motion (see AR 409 (Apr. 2013: "5/5" strength in all major muscles and extremities), 447-48 (May 2013: full range of motion in extremities, "[n]ormal" back, and "gross abs[]ence of neurological motor or sensorial impairment"), 568 (July 2013: "normal" range of motion in extremities and back, "normal" motor function, and "no obvious gross deficits" in sensation), 631 (Sept. 2013: "normal" strength and tone); see also AR 665 (July 2014: "[n]ormal" range of motion, muscle tone, and strength, with no "muscle atrophy" or "focal motor or sensory deficit[s]"), 661 (Aug. 2014: same), 657 (Sept. 2014: same), 653 (Oct. 2014: same), 649 (Nov. 2014: same)).

Moreover, Dr. Kwok opined that Plaintiff could stand or walk for only less than an hour (AR 610), and Dr. Geula found that he could stand or walk for up to an hour (AR 767); these limitations were undermined by findings of "normal" gait (see, e.g., AR 568 (July 2013), 631 (Sept. 2013)) and Plaintiff's evidently "good" tolerance for exercise, physical exertion, and stress (see AR 515 (Apr. 2012); see also AR 679 (Jan. 2015)). Substantial evidence thus supports the ALJ's finding that Drs. Geula's and Kwok's opinions were inconsistent with the medical record. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed

42

on [plaintiff]"); <u>Rollins</u>, 261 F.3d at 856 (ALJ permissibly
rejected physician's opinion when it was contradicted by or
inconsistent with treatment reports); <u>see also</u> <u>Thomas</u>, 278 F.3d
at 957 (ALJ need not accept doctor's opinion that "is brief,
conclusory, and inadequately supported by clinical findings").

Testifying medical examiner Morse, after reviewing
Plaintiff's medical record, found that despite "some evidence" of
"small vessel disease," his saphenous vein grafts were "widely
patent" and his left ventricular function was "normal" (AR 108-
09), findings consistent with treating doctor Caceres's (<u>see,</u>
<u>e.g.</u>, AR 858 (Jan. 2013 catheterization revealing "normal"
ejection fraction and "patent" vein grafts), 457-58 (Mar. 2013
echocardiogram revealing "normal" ejection fraction)). Despite
evidence of cervical-spine degenerative disc disease and
radiculopathy, moreover, there was no evidence of any
neurological deficits. (AR 109, 114.)

Based on his review, Dr. Morse assessed Plaintiff with
significantly less restrictive limitations than Drs. Geula and
Kwok; in Dr. Morse's opinion, Plaintiff could lift 10 pounds
frequently and 20 pounds occasionally and sit, stand, and walk
for six hours in an eight-hour workday. (<u>See</u> AR 110-12.) The
state-agency consultants too reviewed Plaintiff's medical records
and assessed him with similar less-restrictive limitations. (<u>See</u>
AR 161-62, 176-77.) The ALJ gave the opinions of the medical
examiner and state-agency reviewers "significant weight" (AR 67),
and Plaintiff hasn't directly challenged the ALJ in that regard.
Those medical opinions, along with the rest of Plaintiff's
medical records, constitute substantial evidence supporting the

ALJ's rejection of Drs. Geula's and Kwok's opinions.  See Saelee,
94 F.3d at 522.[29]

Second, the ALJ found that Drs. Geula's and Kwok's opinions
were "inconsistent with [Plaintiff's] admission of walking as
part of his daily exercise." (AR 67 (citing AR 421).)  This was
a specific and legitimate basis for further discounting their
opinions.  See Morgan, 169 F.3d at 601-02 (finding inconsistency
with claimant's daily activities specific and legitimate reason
to discount treating-source opinion); Coaty v. Colvin, 673 F.
App'x 787, 787-88 (9th Cir.) (affirming ALJ's adverse
determination of treating physician's medical opinion because it
was "speculative and inconsistent" with activities of daily
living), cert. denied sub nom. Coaty v. Berryhill, 137 S. Ct.

_____

[29] The lack of evidentiary support for Drs. Geula's and
Kwok's opinions is unsurprising given that both doctors provided
at least some of their conclusions based on Plaintiff's
subjective reports.  Dr. Geula stated that his functional-
limitation assessments applied as far back as the start date of
the relevant period, "according to patient" (AR 769), and Dr.
Kwok too stated that his limitation assessments started on the
same date "per patient report" (AR 612).  Dr. Geula had
apparently been treating Plaintiff since 2010 (see AR 765) and
Dr. Kwok began seeing Plaintiff in September 2013, but each
nonetheless made his duration finding based only on what
Plaintiff told him (see AR 630-32).  To the extent their opinions
were based on Plaintiff's reports, they were properly discounted
given the ALJ's reasonable partial rejection of his subjective
symptom testimony.  See Fair, 885 F.2d at 605 (upholding ALJ's
rejection of physician's opinion "because it was premised on
[claimant's] own subjective complaints, which the ALJ had already
properly discounted").  Moreover, Drs. Geula's and Kwok's
opinions were formed after the date last insured, in February and
January 2014, respectively.  (See AR 608-12, 765-69); cf. Sion v.
Comm'r of Soc. Sec., No. 2:12-cv-01323-GMN-GWF, 2014 WL 300522,
at *10 (D. Nev. Jan. 27, 2014) (finding that physician's opinion
that "postdate[d]" date last insured and "[did] not specify
whether it applie[d] to the insured period" did not have
"retrospective value" and was properly rejected by ALJ).

2309 (2017); Lunn v. Astrue, 300 F. App'x 524, 525 (9th Cir. 2008) (affirming ALJ's rejection of treating physician's opinion that was "contrary to [plaintiff's] reports of her daily activities").

Plaintiff argues that the daily walking exercise cited by the ALJ was not necessarily "sustained" or sufficiently "intens[e]" to discount Drs. Geula's and Kwok's opinion. (See J. Stip. at 17, 27.) As already discussed in the context of the ALJ's evaluation of Plaintiff's symptom statements, stress tests showed that he had "good" or "very good" exercise tolerance and responses to exertion. (See AR 515, 679.) Plaintiff could exercise, including by walking, for 10 minutes or more before getting winded or experiencing chest pain. Such findings suggested a level of functional ability inconsistent with the severe limitations imposed by Drs. Geula and Kwok — including that he could stand or walk for only up to an hour in an eight-hour workday (AR 610, 767) — supporting the ALJ's reliance on his admitted "daily exercise" as a basis for discounting their opinions. Indeed, Plaintiff's admitted daily activities reflected that he could drive, wash dishes, do laundry, bathe himself, clean, run errands, shop, and cook in addition to walking for exercise. (See AR 116-17, 126, 421, 546.) Plaintiff thus engaged in a variety of activities requiring prolonged sitting, standing, and walking, further supporting the ALJ's rejection of Drs. Geula's and Kwok's opinions as inconsistent with his daily activity level. See Hernandez v. Berryhill, No. 2:16-CV-00650 (VEB), 2018 WL 1033222, at *6 (C.D. Cal. Feb. 23, 2018) (affirming ALJ's rejection of treating physician's opinion

because it was inconsistent with plaintiff's "engag[ing] in a variety of daily activities, including exercise and fishing").

Finally, the ALJ discounted Drs. Geula's and Kwok's opinions because Plaintiff's condition appeared to be controlled with medication, including "Tylenol." (AR 67); see Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling[.]"). But as Plaintiff correctly points out (J. Stip. at 17 (citing AR 412, 532)), the record indicates that Plaintiff said Tylenol provided him no relief (see AR 412, 532). Although the ALJ thus apparently erred in his reference to Tylenol, the record nonetheless indicates that Plaintiff's pain symptoms seemed to be relieved by medication, specifically his narcotic prescriptions (see, e.g., AR 566-69 (July 2013: symptoms were "alleviated by hydrocodone" and "markedly improved after [medication-based] treatment"), 628 (Oct. 2013: "pain . . . is made better by medication"), 626 (Nov. 2013: "[pain] is made better by . . . medication"); see also AR 112 (Dr. Morse testifying that Plaintiff's symptoms could be "well-controlled on his medication")), thus supporting the ALJ's reasoning in this regard (see AR 64-65 (ALJ describing elsewhere in his decision medications prescribed to "control" Plaintiff's symptoms and noting times when his pain "improved with medication").) In any event, any error by the ALJ was harmless because he provided other specific and legitimate reasons for discounting the doctors' opinions, as discussed above. See Howell v. Comm'r Soc. Sec. Admin., 349 F. App'x 181, 184 (9th Cir. 2009); DeBerry v. Comm'r of Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir.

2009).

b. *Dr. Caceres*

As Defendant concedes (J. Stip. at 24), the ALJ failed to even mention let alone address Dr. Caceres's February 2014 opinion, which included many functional limitations similar to those assessed by Drs. Geula and Kwok (see AR 67; see also AR 759-64).[30] The ALJ instead appeared to address as an "opinion" Dr. Caceres's postprocedure discharge instructions, from January 2013, advising Plaintiff to "avoid heavy lifting, exercise, or excessive bending for 48 hours." (See AR 66 (citing AR 459).) The ALJ's failure to consider Dr. Caceres's actual February 2014 opinion was likely error. See Marsh v. Colvin, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its [sic] decision totally ignore a treating doctor and his or her notes, without even mentioning them."); Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("[A]n ALJ errs when he rejects a medical opinion . . . while doing nothing more than ignoring it[.]").

But unlike in Marsh and Garrison, the ALJ did not "totally" ignore Dr. Caceres and his findings. He specifically mentioned Dr. Caceres and thoroughly discussed his treatment records,

---

[30] The February 2014 functional limitations at issue were written in two distinct handwritings. (See AR 759-64.) It is not clear which is Dr. Caceres's or who wrote the other notations, when, or why. Nonetheless, Dr. Caceres signed the report, so the Court assumes he made or adopted each statement in it.

47

including the many stress echocardiograms he conducted and the catheterization procedure he performed. (See AR 63-64); cf. Marsh, 792 F.3d at 1171 (ALJ's decision "nowhere mentions [the treating physician at issue] or his . . . notes"); Garrison, 759 F.3d at 1013 (ALJ "ignored most of [treating physician's] records including . . . dozens of medical test results, and [his] own treatment notes"). As highlighted by the ALJ, Dr. Caceres's treatment notes indicated mostly "normal" or "mild" findings. (See AR 63.) Because those findings contradicted his own restrictive functional-limitation assessments, they constituted a specific and legitimate basis for the ALJ to implicitly reject his opinion. See Larkins, 674 F. App'x at 633 (ALJ properly rejected physician's opinion that was "inconsistent . . . with his own findings"); Hernandez v. Berryhill, 707 F. App'x 456, 457-58 (9th Cir. 2017) (inconsistency with "own treatment notes" is specific and legitimate reason for discounting physician's opinion); see also Magallanes, 881 F.2d at 755 (ALJ need not recite "magic words" to reject physician's opinion and court may draw "specific and legitimate inferences" from ALJ decision).

Even assuming that the ALJ erred by not expressly discussing the February 2014 functional limitations, any mistake was harmless. Dr. Caceres's opinion largely tracked the exertional limitations found by Drs. Geula and Kwok. For example, Dr. Caceres found that Plaintiff could sit, stand, or walk for only one hour in an eight-hour workday (AR 761), whereas Dr. Geula found that he could stand or walk for an hour but sit for two hours (AR 767) and Dr. Kwok found that he could sit, stand, or walk for less than an hour each (AR 610). Furthermore, Dr.

48

Caceres found that Plaintiff could lift and carry only up to 10 pounds occasionally (AR 761-62); Dr. Geula found that he could lift and carry five pounds frequently but lift 20 pounds and carry 10 pounds occasionally (AR 767); and Dr. Kwok found that he could lift and carry no more than five pounds and only occasionally (AR 610).  Overall, Dr. Kwok's opinion was more restrictive than Dr. Caceres's and Dr. Geula's was slightly less so.  (See J. Stip. at 26 (Plaintiff conceding that Dr. Caceres's limitations were "slightly less restrictive" than Dr. Kwok's).) Accordingly, because the ALJ properly rejected both Dr. Kwok's and Dr. Geula's opinions, substantial evidence supported the ALJ's implicit rejection of Dr. Caceres's similar opinion. See Kelly v. Colvin, 669 F. App'x 401, 401-02 (9th Cir. 2016) (finding ALJ's error in not discussing two physician's opinions harmless because he "did discuss" and "discount[]" "opinions of [other doctors] who concluded that [claimant] had more substantial limitations" and ALJ's errors "were not likely to have affected [his] decision that [claimant] was disabled"); (see also J. Stip. at 26 (Plaintiff arguing only that ALJ's rejection of Dr. Kwok's opinion did not imply rejection of Dr. Caceres's and making no argument regarding implications of his rejection of Dr. Geula's opinion)).  Thus, remand is unwarranted on this ground.

VI.  **CONCLUSION**

      Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[31] IT IS ORDERED that judgment be entered
AFFIRMING the Commissioner's decision, DENYING Plaintiff's
request for remand, and DISMISSING this action with prejudice.


DATED: May 22, 2018                    _____
                                       JEAN ROSENBLUTH
                                       U.S. Magistrate Judge

---

      [31] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."